*IN THE UNITED STATES DISTRICT COURT*
*FOR THE WESTERN DISTRICT OF MICHIGAN*
*SOUTHERN DIVISION*


UNITED STATES OF AMERICA,

                Plaintiff,

vs.                              Case No.  1:25-mj-35

MICHAEL DAVID BLEDSOE,

                Defendant.
_____/

*PRELIMINARY AND DETENTION HEARING*

*BEFORE THE HONORABLE SALLY J. BERENS*
*United States Magistrate Judge*

*Grand Rapids, Michigan, Wednesday, February 5, 2025*


APPEARANCES:
For the Plaintiff:  AUSTIN JACOB HAKES
                      U.S. Attorney
                      330 Ionia Ave., NW
                      Grand Rapids, MI 49501-0208
                      (616) 456-2404

For the Defendant:  HELEN C. NIEUWENHUIS
                      Federal Public Defender
                      50 Louis St. NW, Ste. 300
                      Grand Rapids, MI 49503-2633
                      (616) 742-7420

REPORTED BY:          TRISHA N. CAMERON, CSR, RMR, CRR, RDR
                      Federal Official Court Reporter
                      128 Federal Building
                      Lansing, Michigan 48933

Grand Rapids, Michigan

February 5, 2025

9:08 a.m.

*PROCEEDINGS*

THE CLERK:  Court calls Case No. 25-mj-35, United States versus Michael David Bledsoe.

THE COURT:  Good morning, everyone.  We are on the record this morning for two hearings, a preliminary hearing and a bond hearing.  Let's start with appearances and introductions.

MR. HAKES:  Good morning, Your Honor.  Austin Hakes on behalf of the United States, and with me at counsel table is FBI Special Agent Scott Robinson.

MS. NIEUWENHUIS:  And Helen Nieuwenhuis on behalf of Mr. Bledsoe, Your Honor, and he is here as well seated to my right.

THE COURT:  Good morning to all of you.

All right.  So, Ms. Nieuwenhuis, how would your client like to proceed today?

MS. NIEUWENHUIS:  Your Honor, we'll be waiving our preliminary hearing, but we would like to be heard on detention.

THE COURT:  All right.  Mr. Bledsoe, you understand that you're entitled to a preliminary hearing at which the government would have to demonstrate that there's probable

cause to support the criminal complaint?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And is it your decision, as Ms. Nieuwenhuis says, to waive that hearing today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Has anyone threatened you with anything or promised you anything to get you to give up your right to that hearing?

THE DEFENDANT:  No, Your Honor.

THE COURT:  So that's a choice you're making of your own free will?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Up on the screen we have the Court's waiver of a preliminary hearing form.  Is that your signature on the form?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And did you read and understand that form before you signed it?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I do find then that that is a knowing and voluntary waiver of the preliminary hearing, and I'll bind the defendant over for further proceedings before the Grand Jury. It looks like we'll schedule an arraignment and an initial pretrial conference, assuming that there is an indictment by then, on Thursday, February 20th, at 10:15 a.m.

1       That then brings us to the question of bond.

2   Mr. Hakes, I assume the government is still seeking detention.

3           MR. HAKES:  It is, Your Honor.

4           THE COURT:  All right.  You may proceed.

5           MR. HAKES:  Thank you, Your Honor.  And I know in

6   past cases, the Court has preferred that we proffer any facts,

7   then sit down and argue the law.  Is that how the Court would

8   like to proceed today?

9           THE COURT:  Yes, please.

10          MR. HAKES:  Okay.  So factually, I think the FBI

11  barely caught Mr. Bledsoe in time before he made actual child

12  pornography featuring his stepdaughter who lived with him.  So

13  the Court is familiar with the facts in the continuation

14  supporting the criminal complaint, and that continuation

15  describes how it is that Mr. Bledsoe came to the FBI's

16  attention, and it was through a series of chats on multiple

17  platforms.

18          So Mr. Bledsoe began first speaking with an online

19  undercover employee, or OCE, on the application Kik in mid

20  October of 2024 on a Daulove chat.

21          THE COURT:  I want to pause you for just a second.

22  My computer's PDF thing broke again.  Could we -- could you

23  ask Julie to print out a copy of the complaint and have

24  her --

25          MR. HAKES:  I actually have an extra copy.

1    THE COURT:  If you do, that would be great.  We've
2    been having some issues with this computer.
3    MR. HAKES:  Thank you.
4    THE COURT:  Thank you.  All right.
5    MR. HAKES:  So the chat begins in a Daulove is the
6    title of the chat, which within the child exploitation
7    community is slang for daughter love.  The content of the
8    chats are so explicit that there's really no need to repeat
9    them in excruciating detail.  They're spelled out in the
10   complaint.

11   But generally, Mr. Bledsoe is making comments about
12   the sexual appeal in his stepdaughter's body who -- and she is
13   a minor well under the age of even 16 in Michigan.  So unable
14   to provide consent to sexual activity at all.  And he's also
15   already talking about wanting to place a hidden camera in his
16   own home so that he can capture images of her.

17   By November, chats with Mr. Bledsoe had moved to an
18   application called Telegram.  Mr. Bledsoe told the person that
19   he thought was just another dad who -- with a sexual interest
20   in his own children, he says he would gladly share camera
21   footage of his stepdaughter if he ever set one up.  In
22   paragraph 16 of the continuation, he talks about how he's
23   previously ejaculated in his stepdaughter's underwear and
24   sometimes left pre-ejaculate on her underwear and then placed
25   it back within her dresser drawer.  And he affirms, I'm

thinking about buying the camera.

The conversation then makes clear that Mr. Bledsoe is interested in more than just his own stepdaughter. He has interest really in any children that he can get access to. And we know that because the conversation took a turn where the online undercover employee represented that he had a daughter, and Mr. Bledsoe had said that he wanted to see her and then actually offers to begin chatting with her on social media applications. The online undercover employee provides Mr. Bledsoe with a username that Mr. Bledsoe believes is now the username of this other 12-year-old child and Mr. Bledsoe begins those chats. He sends pictures of naked children to this person that he thinks is a 12-year-old girl.

By December 5th, he has sent the minor, well, who he believed to be the minor girl, pictures of what would likely constitute child pornography.

And on December 11, he definitely sends this person that he believes to be the 12-year-old girl a lascivious exhibition image. So a minor female displaying her vagina and pubic area in a graphic manner.

He then starts escalating his chats with the purported daughter, asking her not only for pictures of her breasts and buttocks, but specifically mentions her vagina, which he uses a euphemism for, and starts suggesting that this 12-year-old girl remove her panties and show him. The chats

escalate until eventually he's giving her instructions as to
how to masturbate and offering that she could either live
stream or video it and send him so that she could provide her
with pointers.  So this takes us to -- excuse me.  So he could
provide her with pointers.

This takes us to mid December of 2024.  So barely six
weeks ago.  At this point, the FBI has concern about victim
safety and now has probable cause to execute a search warrant
on Mr. Bledsoe's home.  They do so.  The immediate concern is
to ensure the safety of the stepdaughter.

So after ensuring that Mr. Bledsoe and the
stepdaughter are no longer going to be living in the same
dwelling, they interview Mr. Bledsoe to ensure that he hasn't
committed any child molestation offenses, that he hasn't
actually raped a child for his own sexual gratification.

Mr. Bledsoe participates in an interview, and the FBI
is at least reasonably confident that he hasn't committed a
so-called hands-on offense with a child, and it then begins
the review of Mr. Bledsoe's devices.

So this is a point at which -- and now, while the FBI
has strong indicators that Mr. Bledsoe has a sexual interest
in children and also that he has violated multiple federal
criminal statutes concerning child exploitation, the
investigative team at that point thinks that at least they've
mitigated the safety risk to the daughter because she's no

1    longer living in the same household.

2         That changed last week when a more detailed review of

3    the extraction of Mr. Bledsoe's device made clear that he was

4    making child pornography featuring other children.  Now, this

5    is different than many of the other 2251 cases that I'm sure

6    Your Honor has provided -- presided over in so far as none of

7    those images so far as we can tell were created because

8    Mr. Bledsoe found a minor in an actual state of undress and

9    photographed her or because he actually raped any of these

10   children.

11        What appears to have happened is that Mr. Bledsoe has

12   taken, unbeknownst to these children, innocent clothed images

13   of these girls, and we are talking truly innocent images.  For

14   example, one of these images features a girl standing upright

15   in a basketball jersey holding a basketball.  There is no

16   reason that a child or even a parent would think that there

17   would be any need to protect Mr. Bledsoe from accessing this

18   image, and the FBI has now identified that there are at least

19   five and potentially even more minors whom Mr. Bledsoe has

20   taken these innocent pictures of.

21        And then what he has done, first, he began chatting

22   with another user on the Kik application, the same application

23   where he started the Daulove chat that I've described earlier,

24   and he provides a clothed image to the Kik user of a minor

25   child, his stepdaughter, and provides -- and then asks that

user to transform that clothed image into a child pornographic image.

His comments -- the other Kik user's comments on the images are certainly disturbing. Comments like, these are absolutely amazing, I wish I was the one expletive her. And then we have these pornographic images received back from the user.

So the reason that mattered to the FBI is because now it's clear that Mr. Bledsoe is actually creating child pornographic images of his stepdaughter that are now out in the wild on the internet, so to speak. And unfortunately, his stepdaughter was not the only one victimized this way.

By early December, so somewhere between December 2 and December 5, thereabouts, Mr. Bledsoe asks or makes the statement in a Kik chat with the person who just produced this image to him, I will have to look into it, meaning I'll have to look into how you're doing it, how you're making these images.

And thereafter it looks like Mr. Bledsoe then does figure out a way to produce these images himself. He accesses a website that will then transform clothed images of girls, and we are talking about girls primarily in the 12 to 14-year-old age range, into child pornographic images.

At least some of these females are friends who were just posing in a picture with his stepdaughter. I do not know

whether or not Mr. Bledsoe has even met or talked with these girls, but these are pictures that would go up on social media at a volleyball tournament, etcetera. I don't know that there were volleyball pictures. I'm just giving an example of how normal these pictures are and how easy they are to access.

I have some argument related to why this is concerning and why at least the detention, but let me check with --

THE COURT: I did want to ask you -- I understand. I mean, you put that in your brief. I understand that argument.

I'm curious, and it really is a little bit more curiosity, whether or not, I read there was a Hotaling case that I think you cited out of the Second Circuit --

MR. HAKES: That's right.

THE COURT: -- talking about this. Have there been a lot of these cases of production? I mean, as I read the statute, it includes in the definition of child pornography a visual depiction that is a digital image, computer image, or computer-generated image that is -- that is or is indistinguishable from that of a minor engaging in sexually explicit conduct. So it seems that's clearly covered under the statute.

Is that your position, or has there been case law to the contrary?

MR. HAKES: So there is strong case law affirming

that possession of so-called morphed CI is a violation of the

federal statute prohibiting possession of child pornography.

THE COURT:  Okay.

MR. HAKES:  I do not know.  I will have to do more

research because I think it is a more novel legal theory that

the creation -- so the use of a minor -- if you're just using

your image --

THE COURT:  Is it production.

MR. HAKES:  -- have you really used the minor --

THE COURT:  Right.

MR. HAKES:  -- for the purpose of producing a

visual -- visual image depicting sexual exploitation.

So it may be that this attempt with the purported

minor is the only 2251 charge that ends up on Mr. Bledsoe's

indictment.  However, I think it is overwhelmingly likely that

he will face additional charges of receipt and distribution

for the child pornographic images that were exchanged with the

other Kik user and downloaded from the website.

I don't know how -- the number of those charges

because I need to do a more detailed review to assess, hey,

which specific images can we prove were downloaded or sent to

a website.  And I do think it is overwhelmingly likely that he

will face a possession of child pornography charge to account

for his behavior concerning the possession of these images

that were recovered from his devices that feature these girls.

THE COURT: And is -- has the Sixth Circuit commented at all in this area?

MR. HAKES: On the -- it has not commented on the question of whether the creation of morphed CP, CP being child pornography, constitutes a violation of 2251. It has commented on whether the possession of morphed CP constitutes a possessory crime and affirmed that yes, it does.

THE COURT: All right. Thank you.

MR. HAKES: Any other questions on the facts?

THE COURT: Nope. Ms. Nieuwenhuis, sorry. Hang on a second, Ms. Nieuwenhuis.

MR. HAKES: I'm so sorry. I promised that I would check in with my case agent about facts, and then I got distracted. I apologize.

THE COURT: I distracted you. It's okay.

MR. HAKES: So one additional set of facts I'd proffer. One of the minors that was a victim of the creation episode, so clothed image into now morphed AI CP image, is someone that he actually friended on Snapchat and was communicating with in an apparent attempt to actually entice her.

THE COURT: And do you have any -- you said that he friended her on Snapchat. Now I want to know the details of that. To what extent was this actual -- I mean, have you gotten so far as to it be the grooming behavior that we've

been talking about in connection with the fake child, or is it -- what is the content of that?

MR. HAKES: It was -- I think he was initially just trying to connect with the child. I do not think that these chats were as sexually explicit as the ones that were recovered here. I submit to the Court that's because Mr. Bledsoe was intercepted and hadn't gotten there yet.

But I do not think -- I think the rest of Mr. Bledsoe's behavior makes his intent clear, but I do not think the content of those chats reached the degree of sexual explicitness that we -- that I've discussed so far.

THE COURT: All right. Thank you. Ms. Nieuwenhuis.

MS. NIEUWENHUIS: Well, in this case so far, what I've heard is really possession of child pornography, if we go to the law as I currently understand it.

I spent some time last night doing some research on the AI photographs and the manipulation of that, and I did not see anything directly on point that would in my opinion support an attempt under 2251.

And early on when I looked at this, I had sent an e-mail to the government in regards to specifically detention, requesting, you know, why the government was moving to detain Mr. Bledsoe because I think that's going to be a very disputed issue, if there is going to be an indictment under a 2251 count.

         THE COURT:  You're talking about that in terms of the
images found in the phone, as opposed to the attempted
exploitation that is --

         MS. NIEUWENHUIS:  Yes.

         THE COURT:  -- detailed in the complaint, right?

         MS. NIEUWENHUIS:  Yes.  Yes.  Yes.

         THE COURT:  Okay.  So you're not disputing
necessarily --

         MS. NIEUWENHUIS:  I'm just trying to divide --

         THE COURT:  -- that that results in the presumption
today.  What you're saying is as to the rest of it --

         MS. NIEUWENHUIS:  Yes.

         THE COURT:  -- we're not sure how that plays out.
Okay.

         MS. NIEUWENHUIS:  And I really think I'm going to
limit really my response to that today in regards to that, and
obviously that there was no physical contact to any child in
this case.

         THE COURT:  Yeah.  I mean, and both of you should
think about this in your argument.  I mean, the issue here, in
these cases, my job is to figure out can I put enough limits
on a person to prevent them from doing some harm going
forward, and we all know what the standard is.

         In this case, it's all about internet access, right?
And I was talking with the probation officer before the

hearing because he has a job where he is required to use a computer. I don't think I can allow that to happen. He wants to go to his parents' house where they have all kinds of internet capable devices and they want to password protect it, but I don't know that that's sufficient in a case like this. And then there's Alternative Directions. That's an option where he doesn't get to have a phone. Phones are ubiquitous.

So when you get to argument, I'm just going to tell you both that's --

MS. NIEUWENHUIS: Okay.

THE COURT: -- that's really -- I mean, here, the key issue is internet access and ability to -- I mean, obviously also to keep him away from minors, period. But internet access is the harder part. So anyway.

MS. NIEUWENHUIS: Okay.

THE COURT: But I didn't mean to interrupt your proffer of facts.

MS. NIEUWENHUIS: No. No. That's really all I wanted to say in regards to the facts.

THE COURT: Thank you. Mr. Hakes.

MR. HAKES: So, Your Honor, this is a presumption case, and I think this is a case where the presumption should carry and Mr. Bledsoe should be detained. And the reason is because this is not someone that you can trust with a cell phone, and it's certainly not someone you can trust to stay

away from a cell phone.

I was worried at the outset of the -- upon the issuance of the complaint that it would be -- that it would -- this case would in your mind just be categorized along with a case of mere possession or somebody who's only trading child pornography online, already extant child pornography. And I've done my best in my briefing and my factual recitation just to explain why I think Mr. Bledsoe is dangerous.

Let's assume for the sake of argument that Ms. Nieuwenhuis, whose legal research prowess I certainly respect, is correct about the attempted exploitation of the OCE persona being the only viable 2251 charge against Mr. Bledsoe, and I'm just assuming that for the sake of argument. But even if we assume that, the question before the Court is whether Mr. Bledsoe is still a danger to the community, and I submit to the Court that he is.

This is somebody who was -- he was voracious. I mean, this is somebody who had a very aggravated sexual appetite for images featuring 12 to 14-year-old children, and he was determined to get his hands on those really in any ways that he could.

He is somebody who is talking about setting up hidden cameras in his home. It seems like the FBI got to his house before he was able to do so, but he was certainly working his way up to it.

And I don't know the fact -- if the fact of the police knocking at your door should go to your credit when we're assessing your dangerous protensities, right? This is somebody who was just about to, you know, victimize a member of his own household in a way that would have been even more damaging than the acts that he did commit.

But aside from that, this -- the Court could not trust that if Mr. Bledsoe had a cell phone, he wouldn't do what he's done before, which is just scrape pictures of kids on the internet and turn them into child pornography that he can masturbate to.

And if this was just a thought crime, if he is just sitting there thinking about kids for his own sexual gratification, that does not put the community at harm no matter what anybody's opinion of that would be.

But when you are going, not just to the internet but to the child pornography corners of the internet and trading images with other users or uploading them to a server and coming back, those images, it is like releasing a piece of paper into a hurricane. It is going to blow all over. There is -- there will be no way of knowing, no way of assuring these children how many other people have gained access to these images of them.

And there are many circumstances in which people who consume child pornography make efforts to identify the actual

children featured in these images so that they can make

contact with them and harass them online.  So that damage is

potentially already done.  All of -- each of these children is

at risk of being contacted by somebody who finds their images

on the internet.

They are all at risk of suffering the psychological

harm of knowing that these sexual images of them are now out

in the wild, and they also are at risk of the reputational

harm.  If this gets out there, it can certainly affect -- I

mean, the Court is will aware of how difficult it is just to

be a 7th or 8th grade girl socially with this not going on.

This added to the mix if one of these images makes it back to

your friend group and haunts you for -- as you move into high

school and college applications, it's very significant

reputational harm.

So I appreciate that it is a significant ask to ask

the Court to detain someone pretrial where at trial they will

be clothed in the presumption of in sense.  But on these

facts, I just submit that Mr. Bledsoe is somebody who cannot

be trusted to stay away from a cell phone.

As the Court mentioned earlier, cell phones are

ubiquitous.  They are so easy to access.  And really, him

having phone contact or in-person contact with any friend who

is ignorant of the facts of his case, it would be very easy to

persuade someone to give him access to a cell phone.  It would

be very easy to access a cell phone while at work, while out in the community. You do not need the latest version of the iPhone or the Samsung Galaxy to be able to do what he did. You could use a smartphone that's ten years old. As long as it has an internet connection and the ability to send and receive pictures, Mr. Bledsoe has what he needs to continue harming children.

So I'm happy to answer any questions that the Court has. But I, again, just want to end where I started, which is that I think this is a case where the presumption is appropriate and Mr. Bledsoe should be detained pending trial.

THE COURT: All right. Thank you. Ms. Nieuwenhuis.

MS. NIEUWENHUIS: Well, there is a presumption here, Your Honor. However, it is rebuttable, and I think in this case it is rebutted.

Mr. Bledsoe is currently 46 years old. He has absolutely no prior criminal history. He is employed. He has graduated high school. He has an associate's degree. He's working on another degree. This is not a man who's just sitting on his phone creating child porn, as the government is trying to make this Court believe.

There are many conditions that are listed in the pretrial service report that we're asking the Court to look at. I think there is a combination of conditions that we can release Mr. Bledsoe.

1          Last night I looked up some cases where -- were kind

2     of in line with this in regards to the concerns the Court's

3     had in regards to cell phones.  Some of them had installed

4     monitoring software on cell phones and given a cell phone to

5     the individual, and if they violated, then, of course, they're

6     going to have their bond revoked and he's going to jail.

7          THE COURT:  Yeah.  I mean, the problem, of course,

8     is -- I mean, you know this as well as I do, that the issue

9     isn't the phone that is the official phone that the person has

10    their, you know, the monitoring software on.  Certainly we can

11    do that.  The problem is that --

12         I mean, I don't know that I buy Mr. Hakes' argument

13    that I friend would let you use a phone to, you know, create

14    child pornography or that someone would even take that risk

15    and behavior.

16         But let's say I put him in an AD, right?  No work

17    release, so he can't go to work and use his computer.  There's

18    still a gazillion other people there.  And if he gets out at

19    all, he can buy a phone pretty easily, and the behavior can

20    continue that way.  So that's the -- I mean, is that so

21    attenuated a risk that I shouldn't view that as, you know --

22    the standard is reasonably assure the safety of any other

23    person and the community, right?  It's not completely assured.

24         MS. NIEUWENHUIS:  Right.

25         THE COURT:  But there is -- there is a ubiquity of

1   availability of cell phones.  So...

2           MS. NIEUWENHUIS:  Right.  And I mean, if the Court is

3   to make a determination based on looking at Mr. Bledsoe and

4   saying, you know, he has availability to a cell phone, which

5   every individual in this country does, and that's why we're

6   going to lock him up just so he has no access to that, that --

7   I don't think that that is something that the Court can

8   articulate enough to actually have him that he be detained

9   prior to his trial, especially based on these facts.

10          Yes, there are chats.  There are so many times where

11  individuals write things in chats that are either fantasy,

12  never come true, never come to fruition.  And I also think,

13  like I said, based on looking at this, I think the government

14  may have some problems with their -- their main charge in this

15  case.

16          So I am asking the Court to fashion a combination of

17  conditions, and I think that Pretrial Services certainly have

18  outlined many conditions that Mr. Bledsoe would be very easily

19  able to follow, and we are asking the Court to release

20  Mr. Bledsoe on bond.

21          THE COURT:  Thank you.

22          MS. NIEUWENHUIS:  You're welcome.

23          THE COURT:  Mr. Hakes.

24          MR. HAKES:  Two things.  One, my suggestion earlier

25  about contact with a friend, I agree with the Court it would

be really weird to let someone use your cell phone. My point

was just that it's very easy to ask a buddy to pick up a cheap

phone for you from Boost Mobile, and that is the factual

scenario that concerns me.

The last point I want to make is that I think when

the Court assesses reasonably assure the safety of the

community, I think the factor that we often focus on is

likelihood of expected harm. You know, what are the odds that

this bad thing happens? But we really can't assess fairly

whether we've reasonably mitigated a risk without considering

the magnitude of the harm considered.

THE COURT: Yeah. I mean, I will just tell you, you

know, I think about it on an axis right, like small harm, big

risk, you know.

MR. HAKES: Right. Yep.

THE COURT: I understand your point.

MR. HAKES: (Inaudible.) I get it. But the -- and

so I don't mean to belabor the point, if it's one that the

Court already appreciates. But my point is just that if there

is a 1 percent chance that you would get a paper cut when you

checked your mail every day, you would still keep checking

your mail every day. If there was a 1 percent chance, so

99 times out of 100 this does not happen to you at all, but

there's a one more chance that it blows up and you use your

hand -- lose your hand, you would never check your mail, and I

think that's the situation we have here.

I understand that there are conditions we can put in place that would reduce Mr. Bledsoe's access to the internet and to mobile devices. But the magnitude of the harm that we're considering here is very, very great, and Mr. Bledsoe's proclivity to create that harm is also very great. I think that puts us in the mailbox blowing up scenario, and I ask the Court to detain Mr. Bledsoe accordingly.

THE COURT: All right. Thank you.

Okay. Mr. Bledsoe, this matter is governed by the Bail Reform Act of 1984. Under the Bail Reform Act, I have to release you on bond unless I find either by a preponderance of the evidence that you're a risk of flight or nonappearance or by clear and convincing evidence that you're a danger to the community. I'm required to consider the least restrictive condition or combination of conditions that will reasonably assure your appearance and protect the community.

I've considered each of the possible conditions set out in the statute. As you probably read the Pretrial Services Report, they have a long list of conditions that they proffer as being potentially appropriate in this case. It's important to recognize the Pretrial Services Report can't actually consider the offense conduct, and so their recommendations are of somewhat limited value, unless I decide to put you on bond.

1     In this type of case, as the lawyers have both

2  discussed, there is a presumption that there's no condition or

3  combination of conditions that will reasonably assure the

4  safety of any other person or your appearance.  As

5  Ms. Nieuwenhuis noted correctly, the presumption only imposes

6  a burden of production.  It is rebuttable, and the Court's

7  have said the defendant's burden is not heavy in rebutting

8  that presumption.

9     In determining whether there are sufficient

10  conditions to reasonably assure your appearance and the safety

11  of the community, I'm required to consider a number of

12  factors.  Those include the nature and circumstances of the

13  offense that is charged, including in this case it is --

14     This is categorically a crime of violence, correct,

15  Mr. Hakes?

16     MR. HAKES:  That's correct, Your Honor.

17     THE COURT:  Yeah.  All right.  I'm also to consider

18  the weight of the evidence.  So it's not the weight of the

19  evidence of your guilt because you are presumed to be innocent

20  at this point.  It's rather the weight of the evidence that's

21  been presented related to either risk of nonappearance or

22  danger to the community.

23     I'm also to consider your history and characteristics

24  and the nature and seriousness of the danger to any other

25  person or the community that would be posed by your release.

1       In this case, there are a number of factors that are

2  often present in these types of cases that weigh in favor of

3  release.  You have a job.  You have an education.  You have no

4  criminal history.  That is, frankly, very often the case in

5  these type of offenses.  Not always, but often.

6       So when I consider which of these defendants I think

7  is -- are supervisable and on whom I can place sufficient

8  conditions, like placement in a halfway house or placement in

9  a home that doesn't have internet access, I look a lot at what

10  are the dangers to actual children that are going to flow from

11  this offense or potentially could flow from bad behavior in

12  the community while out on bond.  And when it's simply a

13  trading of child pornography, I tend to view that as something

14  that I can put sufficient boundaries on to prevent continued

15  action, to prevent continued trading of child pornography.

16  Also considering the fact that cell phones are ubiquitous and

17  -- but the fact that the trading of child pornography is less

18  serious than the victimization of children.

19       Here -- on the other end of the spectrum are actual

20  hands-on offenses where a child has actually been touched by

21  an adult, and that tends to ramp up the severity such that

22  even a small chance of that is important.  And if I can't --

23  if I don't feel like I have a reasonable assurance that I can

24  make that not happen again, I feel like detention is

25  necessary.

1    This case does fall somewhat in the middle in that

2    there was no hands-on action.

3    What pushes it for me into the zone of detention

4    rather than release is the grooming behavior that occurred

5    with the OCE.

6    The talking about hidden cameras with the

7    stepdaughter is concerning.  Although, as Ms. Nieuwenhuis

8    notes, I don't know whether that actually happened or whether

9    he was actually trying to get a camera for the house.

10    The reaching out to another child who was a friend of

11    the stepdaughter is also very concerning, even without actual

12    communication happening.  I don't put as much weight on that,

13    though, as I do on the specific discussions with someone who

14    the defendant seems to have believed was a young child.

15    And so because of that, I don't think that the

16    defendant in this case has rebutted the presumption.  I am

17    going to order detention and find that -- well, I won't find

18    that there's a preponderance of the evidence that no condition

19    or combination of conditions would reasonably assure your

20    appearance.  I don't think risk of nonappearance is really an

21    issue here.  But I do find by clear and convincing evidence

22    that there is no condition or combination of conditions that

23    would reasonably assure the safety of any other person or the

24    community.

25    I think the lawyers are focused a little bit more on

the production of these morphed images than I am.  It's really more the attempted production with an actual child that is what is guiding my decision here.

So I am going to order that you be held in custody pending trial in this matter.

I'm sure that you don't agree with my decision, Mr. Bledsoe.  But did you understand everything that happened in court today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Anything else we need to take up today, Mr. Hakes?

MR. HAKES:  No, Your Honor.

THE COURT:  Ms. Nieuwenhuis?

MS. NIEUWENHUIS:  No, Your Honor.

THE COURT:  Then we will be adjourned.

THE CLERK:  All rise, please.  Court is adjourned.

*(Concluded at 9:43 a.m.)*

*C E R T I F I C A T E*

       I certify that the foregoing is a transcript from the Liberty Court Recording System digital recording of the proceedings in the above-entitled matter to the best of my ability.

/s/ Trisha N. Cameron
Trisha N. Cameron, CSR, RMR, CRR
U.S. District Court Reporter
Lansing, MI  48933